UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____ x

DAGAN INVESTMENTS LLC, Individually      :      Civil Action No. 1:22-cv-03831-JGK
and on Behalf of All Others Similarly Situated,  :
                                         :      CLASS ACTION
            Plaintiff,                   :
                                         :      SECOND AMENDED COMPLAINT
      vs.                                :      FOR VIOLATIONS OF THE
                                         :      SECURITIES ACT OF 1933
FIRST HIGH-SCHOOL EDUCATION              :
GROUP CO., LTD., SHAOWEI ZHANG,          :
LIDONG ZHU, GUANGZHOU ZHAO,              :
YUANLIN HU, LONGWATER TOPCO B.V.,        :
EQT MID MARKET ASIA III LIMITED          :
PARTNERSHIP, EQT MID MARKET ASIA         :
III GP B.V., EQT FUND MANAGEMENT         :
S.À R.L., COLLEEN A. DE VRIES,           :
COGENCY GLOBAL INC., THE                 :
BENCHMARK COMPANY LLC,                   :
VALUABLE CAPITAL GROUP LIMITED,          :
TFI SECURITIES AND FUTURES               :
LIMITED, AMTD GLOBAL MARKETS             :
LIMITED, MAXIM GROUP LLC,                :
BOUSTEAD SECURITIES, LLC, FUTU           :
INC., US TIGER SECURITIES, INC. and      :
FOSUN HANI SECURITIES LIMITED,           :
                                         :
            Defendants.                  :
_____ x      DEMAND FOR JURY TRIAL

Plaintiff Dagan Investments LLC ("plaintiff"), individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts and upon information and belief as to all other matters based on an investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by First High-School Education Group Co., Ltd. ("FHS" or the "Company"), the Company's press releases, and analyst reports, media reports, and other publicly disclosed reports and information about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a securities class action on behalf of all persons or entities who purchased FHS American Depositary Shares ("ADSs") in or traceable to the Company's March 2021 initial public offering ("IPO") seeking to pursue non-fraud, strict liability claims under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "1933 Act").

2.     FHS is a for-profit education company that operates a network of schools in the People's Republic of China (the "PRC" or "China") that provide high school programs, middle school programs, and tutorial school programs for students seeking to repeat taking the gaokao, China's equivalent of a college placement exam.

3.     Since approximately 2014, the private education sector in China was a growing industry, as competition for entrance into the best universities increased, and parents sought to provide their children with every opportunity (namely, for-profit education) to succeed in school. Thus, by 2021, the for-profit education business in China grew to approximately a $330 billion industry.  Riding on this wave of exponential industry growth, FHS sought to list its ADSs on the New York Stock Exchange ("NYSE").

4.     Concurrently, in March 2021, as the Company was preparing to go public, China kicked off its Two Sessions Parliamentary Meetings ("Two Sessions"), the annual meeting of the two major political bodies in China.  At those meetings, the two political bodies discuss plans for China's policies involving education, the economy, military, trade, diplomacy, the environment, as well as other topics of national importance.

5.     As the Two Sessions began, but unbeknownst to investors and those who would become shareholders in the IPO, the initial reports *in China* regarding the for-profit education industry were grim.  Chinese news agencies began reporting that Xi Jinping, the President of the PRC, was speaking out on his contempt for the for-profit education industry, and calling for a new wave of "comprehensive reforms" to clamp down on the industry's practices, which were seen to add an unreasonable amount of stress on students and their families, including additional costs. Indeed, even in the weeks prior to the start of the Two Sessions, there were reports in China that new regulations applicable to the for-profit education industry were going to be much stricter than had previously been considered.

6.     Having President Xi speak out so strongly against for-profit private education before such a prominent, large gathering, like the Two Sessions, was a blaring warning sign to the industry that a strict crackdown was imminent.  In fact, President Xi has recently been awarded an unprecedented third term to lead China, with some suggesting he will be president for life, and is generally regarded as having unchallenged power in the country.  His authoritative regime controls all aspects of the lives of PRC residents and dictates how businesses are to operate.  If President Xi espouses a policy for China to follow, it will soon be implemented.

7.     Facing the reality that the Chinese Government planned to transform the for-profit education industry, making it harder for education companies to do business, FHS sought to

accelerate the effectiveness of its Registration Statement (defined below), before the Two Sessions concluded.

8.      The Registration Statement, however, was negligently prepared and, as a result, contained untrue statements of material fact, omitted to disclose material information that was required to be disclosed therein, and was not prepared pursuant to the regulations governing its preparation.

9.      Specially, the Registration Statement was affirmatively and materially misleading because it favorably portrayed FHS's student enrollment and growth potential, despite adverse and worsening information that undermined those representations – namely, that the government would issue a host of new regulations which included a slowdown of government approval to open new educational facilities, more scrutiny and restrictions on for-profit education, and curbs on tutoring – information that was available to defendants before the IPO.  Indeed, due to Defendant Zhang's affiliation with one of the two political bodies that met at the Two Sessions – and in particular, his membership within the group's Education Section – he undoubtedly was getting real-time information before and during the meetings which suggested "comprehensive reforms" were imminent.  Even if he was not in attendance at Two Sessions, its meetings were broadcast throughout the PRC and someone directly impacted by those meetings, such as Zhang, would have learned of their content shortly thereafter given their widespread dissemination in the PRC, in the unlikely event they did not hear the speeches when they were made.

10.     Critically, the Registration Statement also failed to warn investors that the new regulations following the Two Sessions were far more severe than represented and posed a material adverse threat to the Company and its business.  Besides the crippling regulations, the Registration Statement also misstated FHS's connection with Hebei Hengshui High School ("Hebei Hengshui"

or "Hengshui High School"), a well-known and prestigious elite school in China.  Hebei Hengshui took the unusual step of publicly issuing a statement that it had no involvement in the IPO.

11.      The Registration Statement also failed to satisfy the affirmative disclosure requirements imposed by Item 5 of Part I of Form 20-F (which is coextensive with the information required under Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303 ("Item 303")) and Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), which collectively required the disclosure of trends, uncertainties, and risks facing FHS at the time of the IPO.

12.      Relying on the negligently prepared Registration Statement, on or about March 11, 2021, defendants commenced the IPO by selling 7.5 million FHS ADSs at $10 per ADS.  The IPO accounted for $75 million in gross offering proceeds.

13.      Ultimately, as the Summer of 2021 approached, the harsh restrictions on for-profit education heralded by President's Xi's remarks at the Two Sessions began to be put into effect by the Chinese Government.  These regulations, known as the Double Reduction and the Implementation Rules (each are described below), limited and further regulated the way that for-profit education companies could do business in China.

14.      When the truth regarding the Registration Statement's material misrepresentations and omissions became known after the IPO, the trading price of FHS ADSs substantially declined. At the time of filing of the initial complaint in this action on May 11, 2022, FHS ADSs traded at $0.88, an approximate 91% decline from the IPO price.  Since the filing of the initial complaint, FHS ADSs have been delisted from the NYSE.

## JURISDICTION AND VENUE

15.      The claims alleged herein arise under Sections 11, 12(a)(2) and 15 of the 1933 Act, 15 U.S.C. §§77k, 77l(a)(2) and 77o.  This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the 1933 Act, 15 U.S.C. §77v.

16.     This Court has personal jurisdiction over each of the defendants and venue is proper in this District.  Defendants conducted the IPO in this District, disseminated the Registration Statement into this District, and solicited purchasers of FHS ADSs in this District.  The FHS ADSs issued in the IPO also traded in this District.

17.     In addition, the Underwriter Defendants (defined below) maintain principal offices in this District and/or conduct business in this District, the depositary for the ADSs issued in the IPO – The Bank of New York Mellon – is located in this District, the Company's agent for service of process is located in this District, and New York law, in addition to the federal securities laws, governs the deposit agreement and the ADSs.  Moreover, in the deposit agreement and the underwriting agreement for the IPO, FHS submitted to the non-exclusive jurisdiction of federal and state courts located in New York, New York.

## PARTIES

18.     Plaintiff Dagan Investments LLC, as set forth in the certification previously filed (ECF No. 1 at 24-25) and incorporated by reference herein, purchased FHS ADSs directly in and traceable to the IPO and has been damaged thereby.

19.     Defendant FHS, incorporated in the Cayman Islands and headquartered in Yunnan Province, China, operates private high schools and middle schools in Western China and provides for-profit tutoring services.  The Company's ADSs, prior to being delisted, traded in New York on the NYSE under the ticker symbol "FHS."  Each FHS ADS represents three Class A ordinary shares of the Company.  The Company maintains a dual-class voting structure designed to concentrate control over the Company in the hands of insiders out of proportion with their economic stake in FHS.  The Company has Class A and Class B ordinary shares, which have the same rights except that Class A shares are not convertible and entitle holders to one vote per share, while Class B shares are convertible into Class A shares and entitle holders to 20 votes per share.

20.     Defendant Shaowei Zhang ("Zhang") founded FHS and has served as FHS's Chief Executive Officer ("CEO") and Chairman since September 2018.  Defendant Zhang, his spouse Yu Wu, and Longwater Topco B.V. beneficially owned all of FHS's issued Class B ordinary shares at the time of the IPO.  Either directly or through affiliated investment vehicles, Zhang beneficially owned 47% of FHS ordinary shares prior to the IPO, and, after the IPO, continued to own 38% of all FHS ordinary shares (both Class A and Class B) entitling him to over 65% voting power over the Company (assuming no exercise of the underwriters' overallotment option).

21.     Defendant Lidong Zhu served as FHS's Chief Financial Officer ("CFO") from August 2019 until his resignation in October 2021.  He was also an FHS director from the time of the IPO until December 31, 2021.

22.     Defendant Guangzhou Zhao served as a FHS director at the time of the IPO.

23.     Defendant Yuanlin Hu served as a FHS director at the time of the IPO.

24.     The defendants identified in ¶¶20-23 are referred to herein as the "Individual Defendants."  Each of the Individual Defendants signed the Registration Statement.  In addition, the Individual Defendants participated in the solicitation and sale of FHS ADSs to investors in the IPO for their own benefit and for the benefit of FHS as directors, executive officers and/or major shareholders of the Company.

25.     Defendant Longwater Topco B.V. ("Longwater") is a company incorporated in the Netherlands and controlled by defendant EQT Mid Market Asia III Limited Partnership. Defendant Longwater was a major sponsor of FHS prior to the IPO, beneficially owning 32% of FHS ordinary shares and party to a shareholders' rights agreement with the Company that gave it special rights and powers over the Company.  Defendant Longwater continued to own 18% of all FHS ordinary shares (both Class A and Class B) after the IPO entitling it to 31% voting power

over the Company (assuming no exercise of the underwriters' overallotment option).  Defendant Longwater sold 2.5 million ADSs representing 7.5 million FHS ordinary shares in the IPO for gross proceeds of $25 million.

26.      Defendant EQT Mid Market Asia III Limited Partnership ("EQT L.P.") is an alternative investment fund that indirectly controlled defendant Longwater at the time of the IPO.

27.      Defendant EQT Mid Market Asia III GP B.V. ("EQT GP") is the general partner of defendant EQT L.P.

28.      Defendant EQT Fund Management S.à r.l. ("EFMS") is an investment management company that has the exclusive responsibility for the management and control of the business and affairs of investment vehicles which constitute the majority of the total commitments to EQT L.P. As such, defendant EFMS has the power to control EQT GP voting and investment decisions, including with respect to defendant Longwater.

29.      The defendants identified in ¶¶25-28 are referred to herein as the "EQT Defendants."

30.      Defendant Colleen A. De Vries ("De Vries") served as FHS's Authorized U.S. Representative at the time of the IPO in her position as the Senior Vice President of defendant Cogency Global Inc.

31.      Defendant Cogency Global Inc. ("Cogency Global") was FHS's Authorized U.S. Representative for purposes of the IPO, and defendant De Vries signed the Registration Statement on her own behalf and on behalf of Cogency Global.

32.      The defendants identified in ¶¶30-31 are referred to herein as the "Cogency Global Defendants."

33.     Defendants The Benchmark Company LLC, Valuable Capital Group Limited, TFI Securities and Futures Limited, AMTD Global Markets Limited, Maxim Group LLC, Boustead Securities, LLC, Futu Inc., US Tiger Securities, Inc. and Fosun Hani Securities Limited are referred to herein as the "Underwriter Defendants."  Pursuant to the 1933 Act, the Underwriter Defendants are liable for the materially false and misleading statements in the Registration Statement as follows:

(a)     The Underwriter Defendants are investment banking houses that specialize in, *inter alia*, underwriting public offerings of securities.  They served as the underwriters of the IPO and shared over $5.25 million in fees collectively for their services.  The Underwriter Defendants determined that in return for their share of the IPO proceeds, they were willing to solicit purchases of FHS ADSs in the IPO.  Each of the Underwriter Defendants designated personnel to the IPO working group, including investment bankers, analysts, associates and counsel, to market FHS ADSs, and those personnel worked on and approved the content of FHS's Registration Statement and other offering materials.

(b)     The Underwriter Defendants demanded and obtained an agreement from FHS that FHS would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws.

(c)     Representatives of the Underwriter Defendants also assisted FHS and the Individual Defendants in planning the IPO and purportedly conducted an adequate and reasonable investigation into the business and operations of FHS, an undertaking known as a "due diligence" investigation.  The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO.  During the course of their "due diligence," the Underwriter Defendants had

- 8 -

continual access to confidential corporate information concerning FHS's operations and financial prospects.

(d)     The Underwriter Defendants solicited and sold in the IPO FHS ADSs to plaintiff and other members of the Class.  The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

**SUBSTANTIVE ALLEGATIONS**

**Education in China**

34.     Formal education in China is comprised of K-12 education and higher education. K-12 education can be further divided into four different stages, namely, preschool, primary school, middle school and high school education, with the latter two combined as secondary education.  Compulsory education in China is comprised of grades K-9.

35.     The Chinese National College Entrance Examination, commonly known as the "gaokao," is the university entrance examination administered in China.  It is held annually, and is the lone requirement for entrance into almost all higher education institutions at the undergraduate level, including for 2 year and 4 year degree programs.  It is usually taken by students in their third and final year of high school.

36.     Before or after students take the gaokao, they need to fill out a form listing the colleges they want admission into.  Each college will have a lowest acceptable score, and if students meet that requirement, they can be admitted.  Otherwise, the student will be rejected and passed on to another nominated school to see if their score meets that school's requirements.

37.     If a student does not meet any of their listed school's minimum requirements, he or she will not be accepted to any college for that upcoming academic year.  But, because the gaokao

has no official age limit, students often redo the entire final year of gaokao preparations to take the test again.

38.     Due to the importance of the gaokao examine in determining a student's higher education prospects, education preparation and readiness is taken very seriously in China.  From a very young age, Chinese students are being forced to complete at a higher educational level – with children as young as second graders staying up till nearly midnight to complete their homework, that is often several grades more difficult.

39.     Due to the importance of education, Chinese parents feel intense pressure to provide the best possible resources to their children, who in turn must work extra hard to keep up in an educational rat race.  In fact, in 2016, more than 75% of students ages 6 to 18 in China attended after-school tutoring classes.  By 2021, a survey of 4,000 parents by the state-backed newspaper China Education Paper found that 92% enrolled their children in extracurricular classes and that half of families spent more than 10,000 yuan ($1,500) each year on such classes.

**First High-School and Its Business**

40.     Another effect of the importance of education in China, and in particular after-school tutoring and gaokao tutoring, is the growth of for-profit education providers.  By 2021, Chinese for-profit education and tutoring had grown to a $330 billion industry.

41.     FHS was founded in August 2012, when it established its first school to provide after-school tutoring services.  Since then, and as of September 30, 2020, FHS has developed a network of 19 schools, offering fourteen high school programs, seven middle school programs and four tutorial school programs for gaokao repeaters (those unhappy with their first gaokao scores who wish to retake the test in the hopes of doing better and gaining admission into a better college or university).  In addition, FHS offers Chinese-English bilingual programs for students interested in pursuing higher education overseas.  As of September 30, 2020, FHS had 25,867 students across

its school network, with 17,230 high school students (including gaokao repeaters) and 8,637 middle school students.

42.     FHS was the largest operator of private high schools in Western China and the third largest operator in all of China in terms of student enrollment as of December 31, 2019.

**Pre-IPO Regulations in the For-Profit Private School and Tutoring Industry**

43.     Due to the intense pressure placed on Chinese students, and the incredible financial burden placed on parents to provide tutoring services to children of all ages, the Chinese Government has explored ways in which it could regulate for-profit private schools, including tutoring services.

44.     On August 10, 2018, the Chinese Ministry of Justice ("MOJ") released a draft of the Rules of the Law on Promoting Private Education draft for public comment (the "Implementation Rules").  The Implementation Rules stipulated, among other things, that foreign-invested enterprises in China and social organizations whose actual controllers are foreign parties shall not hold, participate in, or actually control private schools that provide compulsory education (*i.e.*, K-9) and related-party transactions entered into by private schools shall be open, fair, and just and shall not harm national interests, school interests, or student or teacher interests. According to an article subsequently published by Bird & Bird – an international law firm that conducts business in and has offices throughout China – when the MOJ released the draft rules and the circular seeking comments, "concerns were high that the rules may be further tightened for the education business and its foreign investors."

45.     Other rules sought to restrict the pool of students who were available for private school education.  FHS, like most private schools in the PRC, sought to recruit the nation's top students.    Government policy concerning recruitment, announced and then increasingly implemented by localities prior to the IPO, attempted to curb the ability of private for-profit

schools to attract these high-quality students by making it easier, and fairer, for public schools to enroll these students and, in some cases, even set quotas that applied to public and private high schools.

46.     By the time of the IPO, these government policies were having an impact on FHS, as the pool of high-quality students that it could recruit shrunk.  Without the ability to attract more top students, FHS's schools would increasingly lose their competitive edge, which would also impact FHS's ability to expand.

47.     These policies were yet another example of how the Xi government was implementing regulations that favored public schools over private schools and sought to enact rules that curtailed for-profit private education.

48.     On August 17, 2020, a number of Chinese regulatory agencies including China's Ministry of Education ("MOE"), the Ministry of Finance, and the State Administration of Industry and Commerce, jointly announced the release of the Opinions on Further Strengthening and Regulating the Administration of Education Fees (the "Opinion") for non-profit privately run schools.  The Opinion prohibited the sponsors of non-profit privately run schools from obtaining proceeds from the running of the schools.

49.     On September 1, 2020, President Xi and other high-ranking government officials attended the 15th Meeting of the Central Commission for Deepening Overall Reform, at which guidelines for standardizing private schools for compulsory education were reviewed and approved.  The officials in attendance also affirmed that private schools offering compulsory education should be well-regulated in order to implement the government's education policy and leadership over compulsory education.

50.     On January 18, 2021, China's Central Commission for Discipline Inspection issued an article reviewing recent capital raising by for-profit education companies and reiterated its ongoing oversight and enforcement of prior regulations on the industry.  The article recounted that:

> Educational departments will continue to strengthen daily oversight, continue to control by registering and reviewing online institutions, and gatekeep through strict inspections.  By dynamically updating the black-and-white list, establishing a platform for oversight and reporting, widely accepting oversight from all parties, strictly investigating and severely punishing training institutions' behaviors that violate laws and regulations, and exposing them through various channels, it will serve as warnings and deterrence that guide training institutions to operate compliantly.

*     *     *

> Outside-school online training involves a large-scale market with many people working in the industry and huge groups of students.  Any relevant reforms and policy adjustments may affect the profits and interests of different groups and they are about social harmony and stability.  At present, some localities do not understand enough or pay enough attention to the complexity and difficulty of online training oversight.  It is necessary for local party committees and governments to pay close attention to this, strengthen the top-level design and overall coordination, deploy all relevant departments to jointly regulate, and steadily advance governance and reform.

51.     On February 4, 2021, the MOE released the full text of a speech by Minister of Education Chen Baosheng, outlining the Ministry's priorities in 2021 to tighten supervision in the after-school tutoring sector to "rectify mercenary behaviors, subject training, wrong speeches, anomie of teachers' morality, and false advertisements."  Minster Baosheng stated that:

> An ***urgent problem*** we are facing now is to govern and rectify outside-school training institutions with great force.  If this problem is unresolved, it will be difficult to shape a good educational environment.  The goal to govern and rectify outside-school training institutions is to reduce the burden on students and families, free students from outside-school tutoring on course subjects, and free parents from sending children to or accompany them at such schools.  This must be done, and it must be done proactively.  It is necessary to comprehensively assess the early work of such governance, understand the cause-and-effect chain, straighten out the chain of responsibility, and set a clear new path.  It is necessary to formulate a governance

- 13 -

plan as soon as possible, design a rectification path systematically, and punch with a combination of policies.[1]

52.     The regulatory environment facing FHS within China, and the Company's compliance with existing rules and regulations, was of material importance to investors. FHS itself acknowledged the material importance of its compliance with applicable rules and regulations, citing in SEC filings that "regulatory compliance" with Chinese regulations as among the most important factors affecting the Company's business, financial results, and prospects.

**First High-School Announces Its IPO**

53.     Seizing on the growth of the Chinese for-profit private school and tutoring industry, on January 13, 2021, the Company filed with the SEC a registration statement on Form F-1 for the IPO, which, as amended and supplemented, was declared effective on March 10, 2021 (the "Registration Statement").

**The 2021 Two Sessions Meeting and Its Effect on the For-Profit Private School and Tutoring Industry**

54.     Every year, the two main political bodies of China (the Chinese People's Political Consultative Congress ("CPPCC") and the National People's Congress ("NPC")) meet for the Two Sessions, where plans for China's policies involving education, the economy, military, trade, diplomacy, the environment and more, are revealed.

55.     The Two Sessions begin days apart, with the CPPCC meeting first. The CPPCC is China's top political advisory committee, and its role is limited to advising the government on policy. The CPPCC is made up of approximately 2,200 representatives, from political entities, social groups, professions, various sectors, and various other organizations. Because of the

---

[1]  All emphasis is added, unless otherwise stated.

Chinese Government's structure as a one-party communist dictatorship, the CPPCC is the closest official entity in which the Chinese people may get to have a say in their government, and their country's affairs.

56.    During the Parliamentary Meetings, CPPCC delegates discuss various issues, ranging from education to religion, to economics, to healthcare, to even sports.   The various committees make proposals for the government to consider, with the goal being to better the lives of Chinese citizens.

57.    The NPC, which starts its meeting after the CPPCC starts, is comprised of approximately 2,957 members, and has law-making power, making it the largest parliamentary body in the world.   By way of reference, the NPC is often compared to the United States House of Representatives.   NPC delegates are elected from the Chinese provinces, autonomous regions, and municipalities that are directly controlled by the Central Government and the Special Administrative Regions of Hong Kong and Macau.   Some are chosen based on their professional credentials, but the vast majority of delegates belong to the ruling Communist Party.   The Two Sessions is the only time that the NPC meets in full session.

58.    The NPC's agenda is normally set months in advance – and the 2021 Two Sessions was no exception.   Set to begin on March 4, 2021 for the CPPCC and March 5, 2021 for the NPC, the 2021 Two Sessions marked the start of the 14th five-year plan for China, and the 100th anniversary of the founding of the Communist Party of China.

**Defendant Zhang's Involvement with the CPPCC**

59.    On information and belief, Defendant Zhang is a member of the CPPCC, who was eligible to attend the CPPCC meeting at the Two Sessions.

60.     According to the official website of the Yunnan Province CPPCC, Defendant Zhang was a member of the group's Education Section at the time of the 2021 Two Sessions and is one of twenty-six career or industry based representatives in the Education Section.

61.     As a member of the CPPCC who was eligible to attend the Two Sessions, Zhang had access to, and was likely aware of, the topics that would be discussed, and the news that was being reported on the meetings, especially with regard to the Education Section, to which he was a member.

**Reports in China During the Two Sessions Suggest Imminent Changes In the For-Profit Education Industry**

62.     Unbeknownst to investors until *after* the IPO, Chinese Government leaders in attendance at the Two Sessions had discussed, proposed, and ultimately adopted, stringent regulations governing the educational industry with material adverse repercussions for FHS's business, operations, and financial prospects.  Indeed, the news reports *in China* at the time of the Two Sessions suggested the imminent imposition of "comprehensive reform" that would severely impact the for-profit education industry, and would likely drastically reduce the value of companies such as FHS, and could even threaten whether those companies would exist in their current form, if at all.  Anyone in the Education Section in China at the time – including defendant Zhang, who had ties to the CPPCC and the Two Sessions – was undoubtedly aware of the existence of these regulations and their likely impact on the industry, as many of the Two Sessions speeches, and likely the one delivered by Xi, were broadcast throughout the PRC.

63.     Indeed, by March 6, 2021, news outlets in China began to highlight the Two Sessions' focus on reforming the Chinese for-profit private education and tutoring industry.  For example, the MOE's Media Highlights regarding the Two Sessions, sourced from Xinhua (China's official state news agency), published an article titled "Xi Stresses Safeguarding People's Health,

Building Quality Basic Public Education" – Xi, referring to Xi Jinping, the President of the PRC. The article provided that, "On education, Xi said China must strive to build a high-quality and balanced basic public education service system.  He emphasized the ***socialist orientation*** in running schools, the ***non-profit nature of education*** and developing education that people are satisfied with."  Xi's emphasis on the non-profit nature of education was a sign to the for-profit education industry that their way of doing business was about to change drastically.

64.     Another March 6, 2021 article on CGTN's website (a state-run news organization owned by the Chinese state broadcaster China Central Television) entitled "High-Quality Healthcare, Education Systems Highlighted in China's Two Sessions" recounted that President Xi "noted the need to ***comprehensively promote the reform of education methods***, school-running mode, and management systems to further promote the construction of a high-quality education system."  Xi's remarks indicated that he was emphasizing public education, which would work to the detriment of for-profit, private education.

65.     A March 7, 2021 article entitled, "Feature: 'Develop Education That People Are Satisfied With' - General Secretary Xi Jinping responded to hot issues in education at the joint session with the medicine and health group and the education group of the National Committee of the Chinese People's Political Consultative Conference," reported that Xi had said, "On the one hand, parents want their children to be physically and mentally healthy and have a happy childhood; on the other hand, they are afraid that their children will lose at the starting line of competing scores.  These are social problems that cannot be solved by educational departments alone but that require the joint efforts of all sectors of the society and relevant departments to study and solve."  He concluded his remarks by noting that, "About those prominent problems to which the public react strongly and those behaviors infringing upon the public's interests in the name of

- 17 -

education, we must watch closely and be resolved to set them in the right place and correct them thoroughly."

66.     On March 8, 2021, in an interview of Minjing Ni, a member of the CPPCC and deputy director of Shanghai's municipal educational commission, with The Bejing News entitled "Shanghai Will Launch a 'Combined Punch' This Year to Regulate Outside School Training Institutions," Ni discussed various proposed educational regulations, which would limit the for-profit education industry.

67.     The same day, a Liberation Daily article entitled, "Crack the 'Difficulty of Burden Reduction' and Restore Education to Its Root. Delegates Heatedly Discussed Building a High-quality Education System to Promote the Reform of Education Evaluation and Promote the All-round Development of Children," reported on various members' comments during the Two Sessions discussing ways to reduce educational burdens, with a focus on outside school training institutions' profit-driven behaviors.

68.     On March 9, 2021, an article entitled, "Sensing the Temperature of People's Lives from the 'Educational Hot Issues' of the Two Sessions," reported on Xi's comments at the Two Sessions, that "***Education . . . must not be led by the profits-first logic***.  In reality, whether it is infringing upon the public's interests in the name of education, aggressively engaging in commercialization of education, or creating anxiety about education and increasing the cost of education, they all deviate from the principle of education being beneficial to the public.  ***Treating education as a business to run inevitably leads to all sorts of ills and endless harm***.  It is necessary to treat the roots of the problem, focus on human beings' healthy growth, shed light on the basics of education being for the people, continuously purify the educational ecology, and return

education to its original face."  Again, the statements about Xi's comments further exposed his contempt for the for-profit education industry.

69.     The same day, Tsinghua University News published a proposal from another CPPCC member that suggested a ban on any after-school tutoring company providing courses in Chinese, Math, English, Physics, or Chemistry.

**First High-School Accelerates Its IPO as a Crack-Down on the For-Profit Education Industry Looms**

70.     Before the SEC declared the Registration Statement effective, FHS and the SEC exchanged a series of letters regarding certain inquiries into prior drafts of the registration statement.  For example, on February 5, 2021, the SEC sent FHS a letter regarding clarification on at least 18 items within the then current draft of the registration statement.  FHS responded to the SEC on February 10, 2021.  Then, on February 24, 2021, the SEC sent FHS a letter asking for clarification on at least seven items from the then current draft of the registration statement.  FHS responded to the SEC on March 2, 2021.

71.     Despite the ongoing communications with the SEC, and as the news of the impending crack-down on the for-profit private education and tutoring industry was being discussed at the Two Sessions, with the explicit approval of Xi, Defendant Zhang, on March 8, 2021, sent a letter to the SEC seeking to have the effectiveness of the FHS Form-1 accelerated. The letter provided, in pertinent part, as follows:

> Pursuant to Rule 461 of Regulation C ("Rule 461") promulgated under the Securities Act of 1933, as amended, First High-School Education Group Co., Ltd. (the "Company") hereby requests that the effectiveness of the above-referenced registration statement on Form F-1, as amended (the "F-1 Registration Statement"), be accelerated to, and that the F-1 Registration Statement become effective at, 4:00 p.m., Eastern Time on March 10, 2021 or as soon thereafter as practicable.

> The Company also requests that the registration statement on Form 8-A under the Securities Exchange Act of 1934, as amended, covering the American depositary shares representing Class A ordinary shares of the Company, be declared effective

concurrently with the F-1 Registration Statement (the F-1 Registration Statement, together with the registration statement on Form 8-A, the "Registration Statements").

If there is any change in the acceleration request set forth above, the Company will promptly notify you of the change, in which case the Company may be making an oral request of acceleration of the effectiveness of the Registration Statements in accordance with Rule 461. Such request may be made by an executive officer of the Company or by any attorney from the Company's U.S. counsel, Wilson Sonsini Goodrich & Rosati, Professional Corporation.

The Company understands that the representatives of the underwriters, on behalf of the prospective underwriters of the offering, have joined in this request in a separate letter filed with the Securities and Exchange Commission today.

72.     The same day, Defendant Benchmark Company LLC, sent a letter to the SEC, providing, in pertinent part:

We hereby join the Company in connection with its request for acceleration of the above-referenced Registration Statement, requesting effectiveness at 4:00 p.m., Eastern Time, on March 10, 2021, or as soon thereafter as practicable.

Pursuant to Rule 460 of the General Rules and Regulations promulgated under the Securities Act of 1933, as amended, we wish to advise you that, through the date hereof, 500 copies of the Company's preliminary prospectus dated March 2, 2021 were distributed to prospective underwriters, institutional investors, dealers and others.

The undersigned advise that the underwriters have complied and will continue to comply with the requirements of Rule 15c2-8 under the Securities Exchange Act of 1934, as amended.

73.     In an apparent response to these acceleration requests, the Registration Statement was declared effective on March 10, 2021.  On March 11, 2021, the Company filed with the SEC a prospectus for the IPO on Form 424B4, which incorporated and formed part of the Registration Statement (the "Prospectus").  The Registration Statement was materially false and misleading regarding the Company's business, including its alleged connection to Hebei Hengshui High School, as detailed further below.

74.     The Registration Statement was used to sell to the investing public 7.5 million FHS ADSs at $10 per ADS, generating $75 million in gross offering proceeds.  Of these, defendant Longwater sold 2.5 million ADSs, generating $25 million in gross offering proceeds, none of which went to the Company.  Concurrent with the IPO, FHS also conducted a private placement, selling $4.5 million worth of FHS ADSs to an institutional investor at the IPO price adjusted to reflect the ADS-to-share ratio.

**Events Following the IPO**

75.     Soon after the IPO, media reports emerged ***in the United States*** stating that attendees of the Two Sessions conference had proposed stricter, comprehensive regulations to rein in the for-profit education industry, such as regulations aimed at enhancing teacher quality, limiting fee scams, reducing market abuse, and reducing the stress that for-profit educational companies had placed on students in the Chinese educational system.  Even FHS itself began to acknowledge that the tide was changing.  Ultimately, the combination of regulations that were enacted following the Two Sessions reflected President Xi's disdain for for-profit education and caused a material adverse impact on FHS investors.

76.     For example, a March 2021 APCO Report entitled "The 2021 Two Sessions – A New Pattern for China's Development" which provided a summary of what occurred during the Two Sessions as well as a forecast of what was expected in the future, reported that, "At a CPPCC meeting, President Xi stated that the country's K-12 off-campus education market is a 'social problem', and the Government Work Report pledged to keep off-campus training 'well-regulated,'" likely indicating ***a forthcoming campaign of regulatory reform***.  To capture long-term benefits within the sector, companies will need to remain vigilant in ensuring their offerings are in line with the government's definition of '***well-rounded development***.'"

77.     Similarly, in a March 16, 2021 article entitled "The Educational Outcome of China's Two Sessions (NPC) And (CPPCC) 2021" which also provided a summary of what occurred during the Two Sessions and a forecast of what was to come, stated that, "President Xi Jinping stress[ed] the need to ***broadly stimulate the reforms of education methods***, school running mode, and management system to further promote the building of high quality education."  The article also noted that, "[t]he ***comprehensive reforms in educational system*** will uphold the sustainable growth within the society."

78.     On April 6, 2021, less than a month after the IPO, the Company held its Earnings Conference Call for the fourth quarter and fiscal year of 2020.  On that call, Jackie Chen, an analyst with AMTD LLC, asked about the overall regulation environment of schools in China at the moment.  In response, Defendant Zhang stated:

> For outside schools, such as after-school training and tutoring, ***regulation will be much more strict compared to before***, which also includes ***limiting their operating hours***, especially for K-9 or the mandatory education levels, pretty much ***no new license will be distributed and issued anymore***.

> And for kindergartens, the guiding principle is to be affordable, rather than commercial.  So the current regulation trend is to ***support the regulated growth***, but does not expect the high schools' expansion as long as they concentrate on quality.

79.     On May 12, 2021, news reports revealed that the initial phase of the impending government crackdown on for-profit educational companies in China, and in particular their tutoring businesses, would be much more drastic and far reaching than FHS had publicly disclosed. Sources stated that anticipated rules would include measures such as banning on-campus tutoring classes, prohibiting tutoring services during weekend hours, and the imposition of industry-wide fee limitations.  For example, a *Reuters* article titled "China planning new crackdown on private tutoring sector," stated that regulators had taken adverse actions against for-profit educational companies, summarizing the impending regulatory changes in pertinent part as follows:

***China is framing tough new rules to clamp down on a booming private tutoring industry***, aiming both to ease pressure on school children and boost the country's birth rate by lowering family living costs, sources told Reuters.

The clampdown will also have the effect of cooling China's cutthroat tutoring market for kindergarten through to the 12th grade, or K-12 pupils, that has grown exponentially in recent years to around $120 billion.

*      *      *

The changes being drafted by the Ministry of Education and other authorities target before- and after-school K-12 tutoring, three people with knowledge of the matter told Reuters.

One source said the draft rules could be unveiled as early as by end-June. All three sources requested anonymity as they were not authorised [sic] to speak publicly.

***Under the planned rules, on-campus academic tutoring classes will be banned, as will both on and off-campus tutoring during weekends, two of the people said. Regulators will also clamp down on off-campus tutoring, in particular for English and math, they added, restricting class times on weekdays***.

*      *      *

***The new rules would seek to limit fees charged by companies for tutoring, one of the sources told Reuters***.

*      *      *

The planned rules would add to restrictions imposed in March, including a ban on live-streamed classes for minors after 9 p.m., a crackdown on advertising, and a ban on academic tutoring course offerings for pre-school kids.

80.    On May 14, 2021, China's state council announced rules that would further tighten

regulations on compulsory education and training institutions. The rules were set to take effect on

September 1, 2021.[2]  According to an article on fitchratings.com titled "Legal Changes in Private

---

[2]  These rules are typically referred to as the Implementation Rules, referenced above, which were first proposed in 2018 and are generally distinct from the Double Reduction. However, at times, the media failed to make a distinction between the Double Reduction and the Implementation Rules, when those terms were being used to discuss the regulations put into effect during 2021. No matter how the rules were labeled, the relevant point was that for-profit education was being subject to increasingly intrusive governmental control that would adversely impact FHS's business going forward, which was not disclosed in the Registration Statement.

Education in China: Rising Risks for K-12 Education Companies; Higher-Education Providers Benefit," the new rules "aim to prohibit profit-making in compulsory education," and "expose K-12 school operators to heightened regulatory risks and their revenue growth may slow . . . until they obtain more clarity on how the changes will be implemented."

81.     On May 21, 2021, news outlets reported that President Xi had "reviewed and passed" regulations publicized as the "Double Reduction" measures.  As reported, the reforms represented a clampdown on the "qualification of after-school tutors, false advertising and overcharging for services."

82.     On June 15, 2021, the MOE announced the creation of a new department to regulate extracurricular tutoring schools, aiming to reduce students' excessive academic burden, and "to rein in the fast-developing but also problematic tutoring industry."

83.     The next day, on June 16, 2021, *Reuters* reported that China was poised to unveil a much tougher crackdown on the country's private tutoring industry, relying on four anonymous sources who said the measures would ban vacation tutoring and place restrictions on advertising.

84.     Then, on July 23, 2021, China officially unveiled a sweeping overhaul of its education sector, banning companies that teach school curriculum from making profits, raising capital or going public.  These drastic measures, which are known as the Double Reduction,[3] effectively ended any potential growth in the for-profit tutoring and education sector in China.  A *Reuters* report titled "China bars for-profit tutoring in core school subjects," stated that the "move

---

[3]  The "Double Reduction" refers to a reduction in the total amount and time of commitment required by school homework and a reduction in the burden of off-campus or after-school training programs.  The Double Reduction policy was intended to improve the overall quality of school education, reduce excessive study burdens and protect the health of students, relieve the burdens and anxiety of parents, reduce social inequity, further regulate and standardize off-campus training, and strictly implement the Compulsory Education Law, the Protection of Minors Law and other laws and regulations governing the education industry.

threatens to decimate China's $120 billion private tutoring industry and triggered a heavy selloff in shares of tutoring firms traded in Hong Kong and New York."

85.     On July 24, 2021, China's official state media, including Xinhua News Agency and China Central Television, confirmed the Double Reduction measures and published the "Opinions on Further Alleviating the Burden of Homework and After-School Tutoring for Students in Compulsory Education" issued by the General Office of the CPC Central Committee and the General Office of the State Council.

86.     On July 26, 2021, FHS issued a press release announcing that the Company "will follow the spirit of the Opinion and comply with all relevant rules and regulations in providing high school education services."

87.     That same day, Hebei Hengshui High School issued a public statement that refuted its alleged connection to FHS.  Despite representing in the Registration Statement that FHS "partnered," and had an ongoing relationship with Hebei Hengshui, Hebei Hengshui reiterated that it is a ***public*** high school run by the Hengshui Municipal Government in the Hebei Province and independently enjoys the right to use of the name "Hengshui Zhongxue" (*i.e.*, Hengshui High School or Hengshui Secondary School) and its abbreviation "Heng-zhong" (*i.e.*, Heng-high or Heng-secondary).  Hebei Hengshui further stated it had no affiliation with FHS's IPO in the United States nor authorized FHS or its affiliates to carry out any educational, recruitment, or business activities that use the name Hengshui High School.

88.     The Implementation Rules became effective on September 1, 2021.   The Implementation Rules encompassed 68 articles, covering a broad range of subjects, from the establishment of schools, their organization and activities, their teachers and educators, to their assets and financial management, their management and supervision, their support and rewards,

and even the legal responsibilities of private schools.  In other words, these Rules sought to assert governmental control over virtually every aspect of private, for-profit schools.

89.     On September 28, 2021, FHS issued a press release announcing the Company's financial results for the first half of 2021 ended June 30, 2021, which also began to describe the impact that the new regulations would have on FHS's business.[4]  The same day, FHS held an earnings call with analysts and investors to discuss the Company's first half of 2021 financial results, which was hosted by defendants Zhang and Zhu.  During his prepared remarks, defendant Zhu stated: "At the beginning of this year, we planned for an aggressive school networks expansion plan, but China local education authorities casted tough K9 education regulation environment and such authorities slowed down the approvals on our high school and Gaokao repeater school opening-ups," which "delayed new school openings" and had caused "overstaffing and idle leased premises and facilities."

90.     Thus, Defendants Zhang and Zhu were essentially admitting that they knew FHS's planned expansion was not occurring in the face of the regulations that were on the horizon, yet did not disclose the slow-down in approvals for its expansion plans in the Registration Statement.

91.     On October 13, 2021, FHS issued a release announcing that defendant Zhu had resigned as CFO of FHS, effective October 11, 2021.

92.     On December 16, 2021, FHS issued a press release announcing that it had dismissed its auditor KPMG Huazhen LLP.  The release stated that "KPMG advised the Company of the

---

[4]  Following this press release, the Company, in all financial result press releases going forward, discussed the loss from "discontinued operations" as a result of the Company's compliance with applicable PRC regulations. *See, e.g.*, First High-School Education Group Co., Ltd., Press Release (Form 6-K) (Apr. 13, 2022); First High-School Education Group Co., Ltd., Press Release (Form 6-K) (May 17, 2022); First High-School Education Group Co., Ltd., Press Release (Form 6-K) (Sept. 8, 2022).

material weakness in internal control over financial reporting with respect to the lack of sufficient number of financial reporting personnel with appropriate knowledge, experience and training of U.S. GAAP and SEC financial reporting requirements."

93.     On April 5, 2022, FHS issued a press release announcing that the Company had received a letter from the NYSE stating that the Company was in non-compliance with the NYSE's listing requirements because its total market capitalization and stockholders' equity had fallen below compliance standards.

94.     On May 3, 2022, FHS filed a notice with the SEC that it would not be able to timely file its annual report on Form NT 20-F.

95.     By May 10, 2022, FHS ADSs closed below $1 per ADS – ***more than 90% below*** the price at which FHS ADSs were sold to the investing public a little more than one year previously.

## MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS IN THE REGISTRATION STATEMENT

96.     The Registration Statement was negligently prepared and, as a result, contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make adequate disclosures required under the rules and regulations governing the preparation of such documents.

97.     The Registration Statement specifically instructed that the reader "must not rely on any unauthorized information or representations" and that no one was "authorized to give any information or to represent anything not contained in this prospectus" – meaning the only sources of information relevant for the IPO were those authorized by the Company, *i.e.*, the Registration Statement, including the Prospectus.

98.     The Registration Statement provided that FHS has, "*a highly scalable*, asset-light business model" and that due to the Company's "proven track record, our ability to maintain cooperative relationship with local governments to obtain not only the approval but also the support to operate our schools *has created strong entry barriers and underpins our long-term growth*."

99.     The Registration Statement also stated that it "*partnered*" with Hebei Hengshui, a well-known and prestigious elite school in China, with whom FHS stated it had an ongoing relationship.   This relationship included "developing a series of standardized measures and protocols for each stage in a school's development and for a wide variety of scenarios in school management and operation" and hiring "teachers with work experience at Hebei Hengshui High School to coach our teachers to ensure the consistent implementation of effective teaching methods within our school network."   The Registration Statement listed at least 14 FHS schools that used the Hengshui name as part of the school's name.   The Registration Statement also represented that FHS "intend[s] to *deepen our existing collaboration* with well-known education and/or research institutions, such as Hebei Hengshui High School . . . and explore innovative teaching methods."

100.     Regarding growth, the Registration Statement stated that the private secondary education industry in China experienced a very favorable compound annual growth rate ("CAGR"), with a "CAGR of 18.4%" from 2014 to 2019 and was on track to achieve a "CAGR of 24.9%" from 2019 to 2024.   The Registration Statement represented that this sustained growth was due to a variety of positive factors impacting FHS's business, including "favorable government policies," stating in pertinent part as follows:

> This rapid growth is primarily driven by (1) the increased household wealth and enhanced affordability of private education, (2) growing quality and reputation of private education in China, (3) *favorable government policies which encourage*

*and support the development of private schools*, and (4) unevenly distributed and relatively inadequate high-quality public educational resources.

101.    Similarly, the Registration Statement provided that, "The private high school industry has been, and is expected to continue to be, *an important growth driver of the overall high school industry*."

102.    In addition to purportedly favorable government policies, the Registration Statement attributed FHS's growth to the rapid increase in student enrollment in the Company's courses, which the Registration Statement stated had increased 192% between 2017 and the first nine months of 2020.

103.    The Registration Statement also stated that the "[l]evel of student enrollment" at FHS "directly affects revenues and profitability."  According to the Registration Statement, the total number of enrolled students in FHS schools increased from approximately 8,800 as of December 31, 2017 to over 15,100 as of December 31, 2018, and then to more than 21,200 as of December 31, 2019 and further to over 25,800 as of September 30, 2020.  The Registration Statement stated that FHS expected "student enrollment *will continue to increase*, in line with the *expansion of our school operations*."  The Registration Statement similarly asserted that going forward, "[w]ith the increase in the utilization of our schools in the ramp-up stage and the *expansion of our school network*, we expect that our student enrollment *will continue to increase in the foreseeable future*."

104.    The Registration Statement further stated that FHS is "*well-positioned to seize the enormous and sustainable demand for high-quality high schools in China*."  The Registration Statement highlighted that FHS had "experienced steady growth in our business," stating that the Company had achieved revenue of "RMB206.5 million, RMB253.7 million, RMB336.5 million

(US$49.6 million), RMB216.4 million and RMB282.3 million (US$41.6 million) in 2017, 2018, 2019 and the nine months ended September 30, 2019 and 2020, respectively."

105.    While the Registration Statement stated that there were uncertainties in relation to new legislation or proposed change in the PRC regulatory requirements regarding private education "which ***may*** materially and adversely affect [FHS's] group structure, our business, financial condition and results of operation," the Registration Statement failed to disclose that these purportedly future, contingent risks were ***already*** materializing at the time of the IPO. Additionally, the Registration Statement stated that FHS "***may*** not be able to continue to grow as we did in the past due to uncertainties" such as "delays in obtaining government approvals or licenses, and changes in applicable laws and regulations, some of which are beyond our control," but failed to disclose that these adverse facts were ***already*** materializing.  Indeed, FHS's aggressive expansion plans, which were key to its future success, were already being delayed, as Defendants Zhang and Zhu later admitted.

106.    These statements in ¶¶97-105 were materially false and misleading when made because they failed to disclose the following adverse facts that existed at the time of the IPO:

(a)      that the new rules, regulations and policies to be implemented by the Chinese Government were far more severe than represented to investors and posed a material adverse threat to the Company and its business;

(b)      that high-ranking Chinese Government officials, including President Xi, had expressed growing concern about for-profit, private education in China, including tutoring, and the need for tighter regulation with the intent of curtailing the industry;

(c)      that contemplated Chinese regulations and rules regarding private education were leading to a slowdown of government approval to open new educational facilities which would impact FHS's expansion plans and have a negative effect on FHS's enrollment and growth;

(d)      that contemplated Chinese regulations and rules regarding tutoring would drastically reduce the hours and days when tutoring services could be provided, and impact FHS's gaokao tutoring schools;

(e)      that certain of the Chinese regulations threatened the corporate structure of for-profit private educational entities, such as FHS, imposing restrictions on foreign investment;

(f)      that, as a result, the Registration Statement's representations regarding FHS's historical financial and operational metrics and purported market opportunities did not accurately reflect the actual business, operations, and financial results and trajectory of the Company at the time of the IPO, and the representations about favorable government policies were materially false and misleading and lacked a factual basis, particularly in light of President Xi's statements, which strongly criticized the for-profit education industry and were a harbinger that government policies were not going to be favorable as of the time of the IPO ; and

(g)      Hengshui High School had no affiliation with FHS's IPO in the United States nor authorized FHS or its affiliates to conduct any educational, recruitment, or business activities in the name of Hengshui High School.

107.   Furthermore, the Registration Statement was required to disclose the information required by Form 20-F.  In turn, Item 5 of Part I of Form 20-F, titled "Operating and Financial Review and Prospects," requires an issuer to disclose "***management's assessment of factors and trends which are anticipated to have a material effect on the company's financial condition and***

*results of operations in future periods*."  (Emphasis in original.)  Specifically, Item 5(D), titled "Trend information," provides:

> The company must identify material recent trends in production, sales and inventory, the state of the order book and costs and selling prices since the latest financial year.  ***The company also must discuss, for at least the current financial year, any known trends, uncertainties, demands, commitments or events that are reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition***.

108.    The information required under this paragraph is essentially the same information required by Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303.

109.    In addition, the Registration Statement was required to disclose the information required by Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105, which requires, in the "Risk Factors" section of registration statements and prospectuses, "a discussion of the material factors that make an investment in the registrant or offering speculative or risky" and required each risk factor to "adequately describe[] the risk."

110.    The failure of the Registration Statement to disclose the scope and severity of the adverse government regulations that had been proposed and that would ultimately be adopted by the Chinese Government, negatively impacting FHS's business and operations, violated Item 5 of Part I of Form 20-F, because these undisclosed facts were known to defendants and would (and did) have an unfavorable impact on the Company's net sales or revenues, income from continuing operations, profitability, liquidity and capital resources, and rendered the historical information provided in the Registration Statement not indicative of the future operating results or financial condition of FHS at the time of the IPO.  The impending regulations were an uncertainty that was reasonably likely to have a material effect on FHS's revenue, profitability and income from continuing operations at the time of the IPO.  This failure also violated Item 105, because these

adverse facts created significant risks that were not disclosed even though they were among the most significant factors that made an investment in FHS ADSs speculative or risky.

111.    Indeed, the risk factors discussed in the Registration Statement were themselves materially misleading because they provided generic statements of ***potential or contingent risk***, yet failed to disclose that the potential future adverse impacts described therein ***were already occurring***.  For example, the Registration Statement stated that "[u]ncertainties exist in relation to new legislation or proposed changes in the PRC regulatory requirements regarding private education, which ***may*** materially and adversely affect . . . our business, financial condition and results of operation."  However, the Registration Statement failed to disclose that the governmental regulations being discussed would materially limit the profitability of private education and tutoring institutions such as those run by FHS, as well as the Company's ability to continue to grow.  Moreover, the Registration Statement failed to disclose that President Xi strongly endorsed reforms in the for-profit education sector and in tutoring, which was an unambiguous signal to defendants that strict reforms that would adversely affect FHS were imminent.  Instead, and to the contrary, the Registration Statement misleadingly reassured investors that the legislation introduced in 2018 "shall not have retroactive effect in principle, and except for the situations disclosed in this prospectus, the implementation of the MOJ Draft will not require our existing corporate structure and contractual arrangements to be restructured."  However, the Registration Statement did not disclose the possible impacts of the 2018 regulations, and it did not mention the Double Reduction rules or the Xi-led crackdown on for-profit education and tutoring ***at all***.  The Registration Statement's omission of adverse facts regarding the regulatory environment facing FHS and the Company's slowing growth was materially false and misleading.

**EVENTS FOLLOWING THE FILING OF THE INITIAL COMPLAINT**

112.    On June 24, 2022, FHS issued a press release announcing that it received a letter from the NYSE notifying the Company that it is below compliance standards due to the trading price of the Company's ADSs and that the applicable cure period for the Company to regain compliance expires on December 21, 2022.

113.    On November 17, 2022, FHS issued a press release announcing that it received a letter from the NYSE notifying the Company that the staff of NYSE Regulation has commenced proceedings to delist the ADSs of the Company.  Trading in the FHS ADSs was suspended after the market closed on the NYSE on November 7, 2022.  The release provided that NYSE Regulation reached its decision to delist the ADSs pursuant to Section 802.01B of the NYSE's Listed Company Manual, because the Company had fallen below the NYSE's continued listing standard requiring listed companies to maintain an average global market capitalization over a consecutive 30 trading day period of at least US$15,000,000.  The release further provided that the NYSE would file a Form 25-NSE with the SEC, which would remove the ADSs from listing and registration on the NYSE.  The Company stated that it expected that its ADSs or the underlying Class A Ordinary Shares would be eligible to be quoted on the OTC Markets.  The Company further stated that, to the extent the ADSs or the underlying Class A Ordinary Shares are quoted on the OTC Markets, it expects that such markets may provide less liquidity than the NYSE and that the trading price of the securities may decline.

114.    On November 22, 2022, the NYSE filed a Form 25, with the SEC, removing FHS ADSs from listing and registration on the NYSE.

**CLASS ACTION ALLEGATIONS**

115.    Plaintiff brings this action as a class action on behalf of all persons or entities who purchased FHS ADSs in or traceable to the IPO (the "Class").  Excluded from the Class are

defendants and their families, the officers, directors and affiliates of the defendants, at all relevant times, and members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

116.    The members of the Class are so numerous that joinder of all members is impracticable.  FHS ADSs were actively traded on the NYSE and millions of ADSs were sold in the IPO.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by FHS or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions, including being given an opportunity to exclude themselves from the Class.

117.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law as complained of herein.

118.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

119.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether defendants violated the 1933 Act;

(b)    whether statements made by defendants to the investing public in the Registration Statement misrepresented material facts about the business, operations, and risks of investing in FHS; and

(c)      to what extent the members of the Class have sustained damages and the proper measure of damages.

120.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### COUNT I

**For Violation of Section 11 of the 1933 Act**
**Against FHS, the Individual Defendants, the Cogency Global Defendants and the**
**Underwriter Defendants**

121.    Plaintiff repeats, realleges and incorporates each allegation above as if set forth below.

122.    This Count is brought pursuant to Section 11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against FHS, the Individual Defendants, the Cogency Global Defendants and the Underwriter Defendants.

123.    This Count does not sound in fraud.  Plaintiff does not allege that any of the defendants had scienter or fraudulent intent, which are not elements of a Section 11 claim.

124.    The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

125.    The defendants named herein were responsible for the contents and dissemination of the Registration Statement as signatories and/or directors of the Company or as the underwriters of the IPO.

126.    FHS was the registrant for the IPO.  As the issuer of the shares, FHS is strictly liable to plaintiff and the Class for the material misstatements and omissions.

127.    The Individual Defendants and the Cogency Global Defendants signed the Registration Statement and/or were named as FHS directors in the Registration Statement.

128.    The Underwriter Defendants served as underwriters for the IPO.

129.    None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not materially misleading.

130.    By reason of the conduct alleged herein, each defendant violated, and/or controlled a person who violated, Section 11 of the 1933 Act.

131.    Plaintiff purchased FHS ADSs registered pursuant to the Registration Statement and traceable to the IPO.

132.    Plaintiff and the Class have sustained damages.  The value of FHS ADSs has declined substantially subsequent to and due to defendants' violations.

133.    At the time of their purchases of FHS ADSs, plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein.  Less than one year elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that plaintiff initially filed this complaint. Less than three years have elapsed between the time that the securities upon which this Count is brought were offered to the public and the time plaintiff initially filed this complaint.

## COUNT II

**For Violation of Section 12(a)(2) of the 1933 Act
Against FHS, the Individual Defendants, the EQT Defendants and the Underwriter
Defendants**

134.    Plaintiff repeats, realleges and incorporates each allegation above as if set forth

below.

135.    This Count is brought pursuant to Section 12(a)(2) of the 1933 Act, 15 U.S.C.

§77l(a)(2), on behalf of the Class against FHS, the Individual Defendants, the EQT Defendants

and the Underwriter Defendants.

136.    The defendants named herein were the sellers and offerors and/or solicitors of

purchasers of the ADSs offered pursuant to the Prospectus (which is incorporated in and forms

part of the Registration Statement).

137.    As set forth above, the Prospectus contained untrue statements of material fact,

omitted to state other facts necessary to make the statements made therein not misleading, and

omitted to state material facts required to be stated therein.  Defendants' actions of solicitation

included preparing the inaccurate and misleading Prospectus and participating in efforts to market

the IPO to investors.

138.    Defendants owed to the purchasers of FHS ADSs, including plaintiff and the other

Class members, the duty to make a reasonable and diligent investigation of the statements

contained in the Prospectus to ensure that such statements were accurate and that they did not

contain any misstatement or omission of material fact.  Defendants, in the exercise of reasonable

care, should have known that the Prospectus contained misstatements and omissions of material

fact.

139.    Plaintiff and the other members of the Class purchased or otherwise acquired FHS

ADSs pursuant to the Prospectus, and neither plaintiff nor the other Class members knew, or in

the exercise of reasonable diligence could have known, of the untruths, inaccuracies and omissions contained in the Prospectus.

140.     Plaintiff, individually and on behalf of the Class, hereby offers to tender to defendants those ADSs that plaintiff and the other Class members continue to own, in return for the consideration paid for those shares together with interest thereon.  Class members who have sold their shares are entitled to rescissory damages.

### COUNT III

### For Violation of Section 15 of the 1933 Act
### Against FHS, the Individual Defendants, Cogency Global and the EQT Defendants

141.     Plaintiff repeats, realleges and incorporates each allegation above as if set forth below.

142.     This Count is brought pursuant to Section 15 of the 1933 Act, 15 U.S.C. §77o, against FHS, the Individual Defendants, Cogency Global and the EQT Defendants.

143.     The Individual Defendants controlled FHS at the time of the IPO by virtue of their dominant voting power and status as the Company's controlling shareholders, directors and/or senior officers.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of FHS.

144.     Defendant Longwater controlled FHS at the time of the IPO through its share ownership and its entry into a shareholder rights agreement which provided defendant Longwater with special shareholder rights, including the right of first refusal and co-sale rights, put option and drag-along rights, preemptive rights, and the right to appoint directors to FHS's board of directors, and contained provisions governing the board of directors and other corporate governance matters.

145.    Defendants EQT L.P., EQT GP and EFMS controlled defendant Longwater at the time of the IPO.

146.    Defendant FHS controlled the Individual Defendants and all of its employees.

147.    Defendant Cogency Global controlled defendant De Vries and all of its employees.

148.    The defendants named herein each were culpable participants in the violations of Sections 11 and 12(a)(2) of the 1933 Act alleged in the Counts above, based on their participation in the Company's reporting on financial and operational results to investors, having signed or authorized the signing of the Registration Statement, selling FHS ADSs in the IPO and/or having otherwise participated in the process that allowed the IPO to be successfully completed.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment as follows:

A.    Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding rescission or a rescissory measure of damages;

D.    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper, including permitting any putative Class members to exclude themselves by requesting exclusion through noticed procedures.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  June 19, 2023

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
WILLIAM J. GEDDISH


*/s/ Samuel H. Rudman*
SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
wgeddish@rgrdlaw.com

ABRAHAM, FRUCHTER & TWERSKY, LLP
JACK G. FRUCHTER
LAWRENCE D. LEVIT
450 Seventh Avenue
38th Floor
New York, NY  10123
Telephone:  212/279-5050
212/279-3655 (fax)
JFruchter@aftlaw.com
LLevit@aftlaw.com

*Attorneys for Plaintiff*